**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

FRANK TRPISOVSKY, Derivatively on Behalf of ASPENBIO PHARMA, INC.,

          Plaintiff,

    v.

GREGORY S. PUSEY,
JEFFREY G. MCGONEGAL,
MARK COLGIN,
DOUGLAS I. HEPLER,
GAIL S. SCHOETTLER,
DARYL J. FAULKNER,
DAVID E. WELCH,
MICHAEL R. MERSON,
MARK J. RATAIN,
JOHN H. LANDON,
STEPHEN T. LUNDY,
RICHARD G. DONNELLY, and
ROBERT F. CASPARI,

          Defendants,

    and

ASPENBIO PHARMA, INC., a Colorado corporation,

          Nominal Defendant.

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF
THE SECURITIES EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY,
WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

---

Plaintiff, by his attorneys, submits this verified shareholder derivative complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of AspenBio Pharma, Inc. ("AspenBio" or the "Company") on behalf of the Company against certain of its officers and directors.  This action seeks to remedy the Individual Defendants' (as defined herein) violations of law, including violations of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, waste of corporate assets, and unjust enrichment that have caused substantial monetary losses and other damages to AspenBio, such as to its reputation and goodwill.

2.      AspenBio describes itself as a company that is "developing and commercializing innovative products that address unmet diagnostic and therapeutic needs." Since becoming a publicly traded company in 2003, however, AspenBio has not developed or commercialized any such products that have contributed meaningfully to its top or bottom line.  In fact, the Company has a *net loss of over $50 million* since 2003, has *not recorded a single profitable year* during that time, and has *never reported annual revenues higher than $1.14 million*.  AspenBio was (and is) in dire need of developing and marketing a product that would deliver the Company's first annual net profit as a public company.

3.      AspenBio was originally formed as a producer of proteins for diagnostic applications.  Prior to the relevant period, the Company shifted its primary focus to the discovery, development, manufacture, and marketing of products related to animal healthcare and also became a supplier of human hormones.  In 2003, AspenBio initiated the process of developing the product that would come to be known as AppyScore™ ("AppyScore"), which, during the relevant period, would become the Company's primary focus and the drain of the vast majority of AspenBio's resources.

4.      The Company described AppyScore as a groundbreaking tool for the diagnosis of appendicitis in an emergency room setting.  The Individual Defendants have improperly touted AppyScore as having a potential market of over $1 billion.  In reality, AppyScore is inherently flawed as a tool for the diagnosis of appendicitis.  This fact was well-known to the Individual Defendants, many of whom have extensive backgrounds in the fields of medicine, science, insurance, and diagnostics.

5.      The problem with AppyScore lies in the marker that it was ultimately designed to detect.  This marker, a protein known as MRP 8/14 (also known as S100A8/A9 and calprotectin), is an inflammation biomarker that is present in patients with appendicitis.  While relatively unknown to the general public, MRP 8/14 was well-known within the biochemical field and to the Individual Defendants as a protein also present in patients with a wide variety of inflammatory conditions including gingivitis, recent allograft, septicemia, meningitis, pneumonia, tuberculosis, rheumatoid arthritis, gastrointestinal cancer, inflammatory bowel disease, skin cancer, periodontitis, preeclampsia, AIDS, and numerous others.

6.      In order to utilize AppyScore effectively in the diagnosis of appendicitis, a physician would first have to rule out a host of other interfering conditions, including those in the partial list provided above.  Because MRP 8/14 is present in such a wide variety of conditions and AppyScore is intended for use in an emergency room setting, this is not feasible.  As such, AppyScore is inherently nonspecific, and thus cannot be used as an effective means and instrument for a rapid diagnosis of appendicitis.  Further, because of the wide variety of interfering conditions, it follows that AppyScore test results would be subject to substantial variability, an inevitable byproduct of the non-specific nature of the test.

7.      The Individual Defendants knew, or were reckless in not knowing, that AppyScore inherently lacked specificity in diagnosing appendicitis, and thus was not a useful tool for such a diagnosis.  Nonetheless, the Individual Defendants made AppyScore

the Company's primary focus and directed AspenBio to expend tens of millions of dollars on research & development, U.S. Food and Drug Administration ("FDA") trials, personnel additions, and other unnecessary and wasteful expenditures.

8. While the Board of Directors (the "Board") was sufficiently aware of the inadequacies of AppyScore, AspenBio's shareholders were not. In seeking reelection to their lucrative positions and increased benefits under a shareholder approved incentive plan, the Board failed to disclose material information to the Company's shareholders necessary to make an adequately informed decision in violation of federal law. As a result, the Company's shareholders reelected members of the Board and approved the incentive plans, allowing these defendants to continue to harm the Company, and reap undeserved compensation.

9. Ultimately, the Individual Defendants could not avoid the public revelation that AppyScore test results were too nonspecific and variable for AppyScore to be an effective means and instrument for the diagnosis of appendicitis. On June 7, 2010, the Company announced that preliminary data from its FDA clinical trial showed that there was "unexplained variability" in the trial results. AspenBio's market capitalization fell approximately $72.5 million, or 53% on that day. On July 19, 2010, the Company reported more complete results from this trial, including the very low specificity of the test. On this news, AspenBio's value fell another $11.2 million, or 28%. The trial results showing high variability and low specificity of AppyScore, though a shock to the investing public, should not have come as a surprise to the Individual Defendants given the true nature of the test as known only to them.

10. The effect of the Individual Defendants' conduct on AspenBio's value, culminating in AppyScore's shocking clinical trial results, has been staggering. AspenBio's stock value has plummeted, resulting in a loss of nearly $392 million, or 93% of its market capitalization. This severe decline in market capitalization is especially damaging to small, development stage companies like AspenBio, which relies on borrowing to fund its

research and development. It will be much more difficult, if not impossible, for the Company to raise additional funds on favorable terms as a result of its dramatic market capitalization decline and stock price floundering below $1. Further, as a direct result of the defendants' unlawful conduct, the Company is now the subject of federal securities fraud class action lawsuits on behalf of investors who purchased AspenBio's shares, exposing the Company to significant additional liability.

11. Plaintiff now brings this action to rectify the harm wrought by the defendants' wrongful actions detailed herein, and prevent future harm by these defendants who remain in power at the Company.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this case arising under Article III of the Constitution and 28 U.S.C. §1331 because of claims arising under Section 14(a) of the Exchange Act. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13. Venue is proper in this District pursuant to 28 U.S.C. §1391, because nominal defendant AspenBio is headquartered in this District and because a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this District. One or more defendants either reside in, or maintain executive offices in this District. Many of the acts complained of herein occurred in Colorado.

## THE PARTIES

**Plaintiff Shareholder**

14. Plaintiff Frank Trpisovsky was a shareholder of AspenBio at the time of the wrongdoing of which plaintiff complains and has been continuously since.

**Nominal Defendant AspenBio**

15. Nominal defendant AspenBio is a Colorado corporation with its principal executive offices located at 1585 South Perry Street, Castle Rock, Colorado. AspenBio is engaged in the development and commercialization of products that address unmet diagnostic and therapeutic needs. AppyScore is the Company's lead product candidate.

**The Individual Defendants**

16. Defendant Gregory S. Pusey ("Pusey") is AspenBio's Vice President, Investor Relations and has been since January 2010. Pusey is also an AspenBio director and has been since February 2002. Pusey was AspenBio's Vice Chairman from January 2009 to October 2010; Chairman of the Board from May 2003 to January 2009; and Secretary from at least April 2002 to at least April 2010. Defendant Pusey knowingly, recklessly, or with gross negligence, made improper statements, and failed to disclose the true prospects of AppyScore as a means and instrument for the diagnosis of appendicitis in press releases, conference calls, and U.S. Securities and Exchange Commission ("SEC") filings. Defendant Pusey was also a director when the misleading 2008 and 2009 proxy statements were released. AspenBio paid defendant Pusey the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|------|--------|---------------|----------------------------------------|------------------------|
| 2009 | $150,000 | $54,800 | $38,000 | $18,390 |
| 2008 | $150,000 | $195,400 | - | $20,613 |
| 2007 | $100,000 | $117,450 | $125,000 | - |

17. Defendant Jeffrey G. McGonegal ("McGonegal") is AspenBio's Chief Financial Officer ("CFO") and has been since June 2003 and Corporate Secretary and has been since January 2010. McGonegal was also AspenBio's Interim President from December 2004 to January 2005. Defendant McGonegal knowingly, recklessly, or with gross negligence, made improper statements, and failed to disclose the true prospects of AppyScore as a means and instrument for the diagnosis of appendicitis in press releases,

conference calls, and SEC filings. AspenBio paid defendant McGonegal the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|------|--------|---------------|----------------------------------------|------------------------|
| 2009 | $167,523 | $54,800 | $40,000 | $18,390 |
| 2008 | $110,000 | $156,320 | - | $20,613 |
| 2007 | $100,000 | $117,450 | $80,000 | $20,857 |

18. Defendant Mark Colgin ("Colgin") is AspenBio's Chief Scientific Officer and has been since February 2009. Colgin was AspenBio's Chief Scientist from January 2003 to February 2009 and Director of Recombinant Technology from September 2000 to January 2003. Colgin knowingly, recklessly, or with gross negligence, made improper statements, and failed to disclose the true prospects of AppyScore as a means and instrument for the diagnosis of appendicitis in conference calls and SEC filings. AspenBio paid defendant Colgin the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|------|--------|---------------|----------------------------------------|------------------------|
| 2009 | $146,875 | $54,800 | $23,000 | $11,429 |
| 2008 | $125,000 | - | $26,600 | $12,417 |
| 2007 | $105,000 | - | $60,000 | $12,378 |

19. Defendant Douglas I. Hepler ("Hepler) is an AspenBio director and has been since March 2004. Hepler was also a member of AspenBio's Audit Committee from at least November 2006 to at least April 2008. Defendant Hepler knowingly or recklessly made improper statements in the Company's Forms 10-K and 10-KSB and reviewed and approved improper statements concerning the true prospects of AppyScore as a means and instrument for the diagnosis of appendicitis. Defendant Hepler also knowingly, recklessly, or negligently made materially misleading statements in the 2008 and 2009 proxy statements. AspenBio paid defendant Hepler the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | All Other Compensation | Total |
|------|-------------------|---------------|------------------------|-------|
| 2009 | $12,000 | $54,800 | $3,200 | $70,000 |
| 2008 | $11,500 | $124,786 | $52,900 | $189,186 |
| 2007 | $5,500 | $59,105 | $57,000 | $121,605 |

20.     Defendant Gail S. Schoettler ("Schoettler") is AspenBio's Non-Executive Chair of the Board and has been since October 2010 and a director and has been since August 2001.  Schoettler was also AspenBio's Lead Director from January 2009 to October 2010.  Schoettler is a member of AspenBio's Audit Committee and has been since at least November 2006.  Defendant Schoettler knowingly or recklessly made improper statements in the Company's Forms 10-K and 10-KSB and reviewed and approved improper statements concerning the true prospects of AppyScore as a means and instrument for the diagnosis of appendicitis.  Defendant Schoettler also knowingly, recklessly, or negligently made materially misleading statements in the 2008 and 2009 proxy statements.  AspenBio paid defendant Schoettler the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2009 | $12,000 | $54,800 | $66,800 |
| 2008 | $11,500 | $124,786 | $136,286 |
| 2007 | $5,500 | $59,105 | $64,605 |

21.     Defendant Daryl J. Faulkner ("Faulkner") is an AspenBio director and has been since January 2009.  Faulkner was also AspenBio's Executive Chairman from January 2009 to October 2010 and Interim Chief Executive Officer ("CEO") from February 2009 to March 2010.  Defendant Faulkner knowingly or recklessly made improper statements in the Company's Forms 10-K and 10-KSB and reviewed and approved improper statements concerning the true prospects of AppyScore as a means and instrument for the diagnosis of appendicitis.    Defendant Faulkner also knowingly, recklessly, or negligently made materially misleading statements in the 2009 proxy statement.  AspenBio paid defendant Faulkner the following compensation:

| Year | Salary | Option Awards | All Other Compensation |
|------|--------|---------------|------------------------|
| 2009 | $233,974 | $696,000 | $61,284 |

22.     Defendant David E. Welch ("Welch") is an AspenBio director and has been since October 2004.  Welch is also Chairman of AspenBio's Audit Committee and has been

since at least November 2006. Defendant Welch knowingly or recklessly made improper statements in the Company's Forms 10-K and 10-KSB and reviewed and approved improper statements concerning the true prospects of AppyScore as a means and instrument for the diagnosis of appendicitis. Defendant Welch also knowingly, recklessly, or negligently made materially misleading statements in the 2008 and 2009 proxy statements. AspenBio paid defendant Welch the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2009 | $12,000 | $54,800 | $66,800 |
| 2008 | $11,500 | $124,786 | $136,286 |
| 2007 | $5,500 | $59,105 | $64,605 |

23. Defendant Michael R. Merson ("Merson") is an AspenBio director and has been since July 2008. Merson is also a member of AspenBio's Audit Committee and has been since July 2008. Defendant Merson knowingly or recklessly made improper statements in the Company's Forms 10-K and 10-KSB and reviewed and approved improper statements concerning the true prospects of AppyScore as a means and instrument for the diagnosis of appendicitis. Defendant Merson also knowingly, recklessly, or negligently made materially misleading statements in the 2009 proxy statement. AspenBio paid defendant Merson the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2009 | $12,000 | $54,800 | $66,800 |
| 2008 | $7,000 | $41,681 | $48,681 |

24. Defendant Mark J. Ratain ("Ratain") is an AspenBio director and has been since March 2008. Defendant Ratain knowingly or recklessly made improper statements in the Company's Forms 10-K and 10-KSB and reviewed and approved improper statements concerning the true prospects of AppyScore as a means and instrument for the diagnosis of appendicitis. Defendant Ratain also knowingly, recklessly, or negligently made materially misleading statements in the 2008 and 2009 proxy statements. AspenBio paid defendant Ratain the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | All Other Compensation | Total |
|------|-------------------|---------------|------------------------|-------|
| 2009 | $12,000 | $54,800 | $35,000 | $101,800 |
| 2008 | $10,000 | $59,781 | $35,000 | $104,781 |

25.     Defendant John H. Landon ("Landon") is an AspenBio director and has been since December 2008.  Defendant Landon knowingly or recklessly made improper statements in the Company's Forms 10-K and 10-KSB and reviewed and approved improper statements concerning the true prospects of AppyScore as a means and instrument for the diagnosis of appendicitis.  Defendant Landon also knowingly, recklessly, or negligently made materially misleading statements in the 2009 proxy statement.  AspenBio paid defendant Landon the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2009 | $12,000 | $54,800 | $66,800 |
| 2008 | - | $3,224 | $3,224 |

26.     Defendant Stephen T. Lundy ("Lundy") is AspenBio's CEO, President, and a director and has been since March 2010.  Defendant Lundy knowingly, recklessly, or with gross negligence, made improper statements, and failed to disclose the true prospects of AppyScore as a means and instrument for the diagnosis of appendicitis in AspenBio press releases.

27.     Defendant Richard G. Donnelly ("Donnelly") was AspenBio's CEO, President and a director from January 2005 to February 2009.  Defendant Donnelly knowingly, recklessly, or with gross negligence, made improper statements, and failed to disclose the true prospects of AppyScore as a means and instrument for the diagnosis of appendicitis in press releases, conference calls, and SEC filings.  Defendant Donnelly also knowingly, recklessly, or negligently made materially misleading statements in the 2008 proxy statement.  AspenBio paid defendant Donnelly the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|
| 2009 | $31,250 | - | $54,800 | - | - | $167,876 |

| 2008 | $250,000 | $37,500 | - | $140,719 | - | $30,946 |
| 2007 | $222,917 | - | $74,000 | $234,900 | $280,000 | $31,784 |

28. Defendant Robert F. Caspari ("Caspari") was AspenBio's Chief Medical Officer ("CMO") and Chief Operating Officer ("COO") from February 2009 to August 2010. Defendant Caspari knowingly, recklessly, or with gross negligence, made improper statements, and failed to disclose the true prospects of AppyScore as a means and instrument for the diagnosis of appendicitis in press releases, conference calls, and SEC filings. AspenBio paid defendant Caspari the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|------|--------|---------------|----------------------------------------|------------------------|
| 2009 | $222,596 | $445,200 | $50,000 | $10,483 |

29. The defendants identified in ¶¶16, 19-27 are referred to herein as the "Director Defendants." The defendants identified in ¶¶16-18, 21, 26-28 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶19-20, 22-23 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶16-28 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

30. By reason of their positions as officers, directors, and/or fiduciaries of AspenBio and because of their ability to control the business and corporate affairs of AspenBio, the Individual Defendants owed and owe AspenBio and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AspenBio in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AspenBio and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

31. Each director and officer of the Company owes to AspenBio and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of

the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Additional Fiduciary Duties of the Audit Committee Defendants**

32.     In addition to these duties, under the Company's Audit Committee Charter in effect since December 22, 2003, and amended and restated as of July 29, 2009, the Audit Committee Defendants, Hepler, Schoettler, Welch, and Merson, owed and owe specific additional duties to AspenBio to review the Company's annual financial statements, internal controls, and legal compliance.  In particular, the Audit Committee's Charter provides that the Audit Committee is responsible for monitoring "the integrity of the Company's financial reporting process and systems of internal controls regarding finance, accounting, and legal compliance," which would include AppyScore development and trials because of AppyScore's importance to the Company's future.

33.     The Audit Committee is also responsible for risk assessment, including "areas of potential significant financial risk to the Company," which include the success and FDA approval of AppyScore, as AppyScore was and is the Company's largest investment.  The Audit Committee met five times in 2007, four times in 2008, and eight times in 2009.

**Corporate Governance Guidelines**

34.     Under the Company's Corporate Governance Guidelines, the Board has an "***active***, not a passive, responsibility" for "determining that the Company is managed in such a way as to ensure" the Board fulfills its "primary responsibility … to provide effective governance over AspenBio's affairs for the benefit of stockholders."  According to the Corporate Governance Guidelines, that responsibility includes:

- representing the stockholders' interest in perpetuating a successful business;

- optimizing long-term financial returns;

- evaluating the performance of the chief executive officer;

- reviewing and approving periodically long-term strategic and business plans and monitoring corporate performance against such plans;

- adopting policies of corporate conduct, including compliance with applicable laws and regulations and maintenance of accounting, financial, and other controls, and reviewing the adequacy of compliance systems and controls;

- evaluating periodically the overall effectiveness of the Board and its committees;

- deciding on matters of corporate governance; and

- reviewing and approving AspenBio's budget, compensation plan, and annual performance goals.

35.   More specifically, in setting forth the principal duties of the Board, the Corporate Governance Guidelines state:

> The fundamental responsibility of the directors is to exercise their business judgment to act in what they reasonably believe to be the best interests of AspenBio and its stockholders. It is the duty of the Board to oversee the Chief Executive Officer and the other members of senior management who together run AspenBio on a daily basis. The Board also monitors management's performance to ensure that AspenBio operates in an effective, efficient and ethical manner in order to produce value for AspenBio's stockholders. The Board also evaluates AspenBio's overall strategy and monitors AspenBio's performance against its operating plan and against the performance of its peers.

The above sets forth the Board's fundamental responsibility to oversee AspenBio's management and evaluate the Company's strategy, which includes the strategic decision to focus the Company's efforts and capital on AppyScore.

**Control, Access, and Authority**

36.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of AspenBio, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

37.     Because of their advisory, executive, managerial, and directorial positions with AspenBio, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of AspenBio. While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including information about AspenBio's financial results and business prospects.

38.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AspenBio, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

39.     To discharge their duties, the officers and directors of AspenBio were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of AspenBio were required to, among other things:

(a)     properly and accurately guide investors and analysts to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health, including the prospects for the use of AppyScore as a means and instrument for the diagnosis of appendicitis;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed of how AspenBio conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices,

make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

40. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of AspenBio, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of AspenBio's Board.

41. The Individual Defendants breached their duty of loyalty by directly causing, or allowing, the Company to misrepresent its financial condition and results. In particular, the Individual Defendants made improper statements concerning the prospects of AppyScore as a means and instrument for the diagnosis of appendicitis. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. Because of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of class action lawsuits that allege violations of securities laws. Thus, AspenBio has expended, and continues to expend, significant sums of money.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

42. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in

concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

43.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to make improper statements, despite the fact that they knew, or were reckless in not knowing, that these statements were untrue.

44.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise their breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

45.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly make improper statements about the prospects of AppyScore, despite the fact that they knew, or were reckless in not knowing, that these statements were untrue.

46.     Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## THE DEVELOPMENT OF APPYSCORE

48.     In 2003, the Company set out to identify a biological marker differentially associated with appendicitis.   In this context, a "marker differentially associated with appendicitis" means some kind of detectable molecule that is found in patients with appendicitis but not in patients without appendicitis, or in certain differing levels between the two.   Indeed, according to the Company's Form 10-KSB filed with the SEC on March 26, 2004, "AspenBio aims to … identify[] novel diagnostic markers" for the diagnosis of appendicitis.   In 2004, the Company also initiated the establishment of an intellectual property portfolio for its blood-based appendicitis testing technology and products.

49.     It is not clear when this initial effort failed.   What is clear is that by the start of the relevant period the Individual Defendants had given up on identifying a novel, differential marker.   Instead, while continuing to tell the investing public that AspenBio was developing a novel test for appendicitis, the Individual Defendants had turned to MRP 8/14 and determined to build the AppyScore test around that marker.

50.     While relatively unknown to the general public, MRP 8/14 and its limitations were familiar within the biochemical research field.   For example, in early 2003 two researchers published a study titled "Calprotectin – a Pleiotropic Molecule in Acute and Chronic Inflammation."   According to the study, MRP 8/14 was discovered in 1983, and as early as 1984 it had already been recognized as a "promising marker of inflammation."   Thus, the use of MRP 8/14 as a marker was in no way novel or unique.

51.     Further, the study listed and described a laundry list of conditions in which MRP 8/14 is present, often at elevated and varying levels.   The conditions include: organ transplantation (allograft), septicemia, meningitis, pneumonia, tuberculosis, rheumatoid arthritis, gut inflammation (including gastrointestinal cancers and inflammatory bowel disease), skin cancer, gingivitis, and periodontitis.    Notably, the study recognized that the same elevated levels of MRP 8/14 are seen in septicemia, meningitis, and pneumonia.

52. Indeed, researchers had already proposed testing for MRP 8/14, but only as a general indicator of inflammation. This is because the presence of MRP 8/14 at elevated and varying levels in so many different conditions renders such a test inherently nonspecific. Further, during the relevant period there were already available means and instruments for the detection of MRP 8/14. AppyScore, which the Individual Defendants claimed was an effective tool for diagnosing appendicitis, was simply a glorified version of such a test. Contrary to these claims, AppyScore was close to useless as a specific appendicitis diagnostic tool.

53. In order for a physician to effectively use AppyScore, he or she would first be required to rule out all of the interfering conditions that present MRP 8/14. Due to the large number and wide variety of such conditions, as well as the Company's expectation that AppyScore would be used in emergency rooms - typically environments where time and resources are relatively limited - this is simply not feasible. Worse yet, one of the conditions necessary to rule out is septicemia, which itself is present in acute (advanced-stage) appendicitis. Thus, a physician would have to rule out a severe stage of the very affliction he or she is attempting to diagnose before being able to utilize AppyScore. AppyScore is simply too nonspecific to serve as a means and instrument for the diagnosis of appendicitis.

54. The Individual Defendants were aware of this fundamentally disabling problem with AppyScore. When the Company submitted its February 2006 AppyScore-related patent application to the United States Patent and Trademark Office ("USPTO"), it admitted the presence of the numerous interfering conditions which render AppyScore ineffective. The patent application stated:

In one embodiment of this invention *patients are screened to determine whether or not they have an "interfering condition," i.e., another condition* in which the molecule is present in the type of sample being tested. *Patients are tested for the presence of the molecule if they do not have such an interfering condition*; or are tested for the presence of appendicitis-diagnostic levels of the molecule if they do have such an

interfering condition Appendix-diagnostic levels when the patient has an interfering condition are levels higher than those present in patients who have the interfering condition but do not have appendicitis. ***Interfering conditions include recent allograft; septicemia; meningitis; pneumonia; tuberculosis; rheumatoid arthritis; gastrointestinal cancer; inflammatory bowel disease; skin cancer, periodontitis, preeclampsia, and AIDS***.

The Company's own patent application, therefore, shows that the AppyScore test for the MRP 8/14 molecule would only work on patients with no interfering conditions. Because testing for and ruling out each and every interfering condition is simply not feasible, the Individual Defendants knew, or were reckless in not knowing, that AppyScore was too nonspecific to function as an effective appendicitis diagnostic tool.

55. Nonetheless, the Individual Defendants embarked on a path to deceive the investing public by issuing a prolonged series of improper statements regarding AppyScore and its prospects as a means and instrument for the diagnosis of appendicitis. To support those improper statements, the Individual Defendants also carried out a massive overhaul of the Company's business and personnel to shift its focus primarily and overwhelmingly to AppyScore. Indeed, referring to the Company's AppyScore-centric business, one analyst described AspenBio as having "[a]ll [of its] Eggs in One Basket."

56. By 2008 and 2009, the Individual Defendants had shifted nearly 75% of the Company's research and development spending to AppyScore. These expenses, $4.4 million in 2008 and $6.3 million in 2009, were largely attributable to the pre-clinical and clinical FDA trials. AppyScore was doomed to fail in these trials, as the Individual Defendants knew, because the test is completely nonspecific for appendicitis and would thus, show a very low specificity and very high variability in any trial. The Individual Defendants nonetheless poured millions of dollars into AppyScore, including $10.7 million in 2008 and 2009 alone, to maintain the façade that the test had the potential to be a groundbreaking achievement for the Company and the medical industry as a whole.

57. The Individual Defendants also expended significant sums adding Board and executive level personnel to the Company for the purported specific purpose of

advancing AppyScore. Several million dollars of Company funds were expended to recruit and compensate this new personnel, who were brought into AspenBio to keep up the appearance that AppyScore was a novel product with great potential. These additions included the following:

(i)      the addition of defendant Ratain as a director in March 2008, who was touted as having extensive experience that would benefit efforts to bring AppyScore to market;

(ii)     the addition of defendant Merson as a director in July 2008, who was touted as possessing "knowledge, wisdom and experience" that would "greatly benefits [the Company's] board";

(iii)    the addition of defendant Landon as a director in December 2008, who brought "valuable expertise to AspenBio at a time when [the Company was] advancing [its] appendicitis products towards commercialization";

(iv)    the addition of defendant Faulkner as executive chairman in January 2009, who brought a "long record" in the "development and commercialization of important medical products"; and

(v)    the addition of defendant Caspari as COO and CMO in February 2009, whose main responsibilities included "managing the development, FDA clinical trial and submission activities for AppyScore."

58.     Upon joining AspenBio, each of the Individual Defendants listed above became complicit in the scheme to deceive the investing public as to the prospects of AppyScore as a means and instrument for the diagnosis of appendicitis. Each of the Individual Defendants knew, or was reckless in not knowing, that AppyScore had no such potential. However, the Individual Defendants proceeded to make improper statements regarding AppyScore's potential despite this knowledge and funnel more of the Company's resources into this practically useless test.

**IMPROPER STATEMENTS CONCEALING THE TRUE PROSPECTS OF
APPYSCORE AS A DIAGNOSTIC TOOL FOR APPENDICITIS**

59.     On November 27, 2007, the Company issued a press release announcing that
it planned to follow the 510(k) pathway to FDA regulatory clearance for AppyScore.
Regarding the announcement, defendant Donnelly commented:

> ***This represents another major milestone in the advancement of our
> breakthrough screen test for appendicitis*** … and demonstrates the strength
> of our initial clinical results and particularly the high sensitivity of
> AppyScore. We expect the FDA 510(k) to be a faster and easier path for
> regulatory clearance and introduction of this product. ***Most importantly, it
> creates the possibility of being able to begin marketing the first version of
> this test in the United States and certain international markets in 2008***.

Thus, defendant Donnelly improperly characterized AppyScore as a "breakthrough screen
test" when it was in fact just another version of existing MRP 8/14 blood-based assay tests.
Further, Donnelly improperly stated that AppyScore could be brought to market in 2008
when he knew, or was reckless in not knowing, that AppyScore was not marketable due to
its inherent inability to be utilized as an effective diagnostic tool for appendicitis.

60.     Even at AppyScore's purported 40% level of specificity, which would later
be shown to be grossly inflated, analysts began questioning the marketability of
AppyScore.  This flowed through to a general hesitancy concerning AspenBio, which had
almost completely shifted its goals to focus singularly on AppyScore.  In a March 7, 2008
report, titled "All Eggs in One Basket is Too Much Risk For Us; Downgrade to Perform,"
analyst Amit Hazan with Oppenheimer expressed concern that the majority of the
Company's market value was tied up in AppyScore, which had demonstrated less than
stellar pre-clinical specificity.

61.     The Individual Defendants, however, continued to issue improper
statements in AspenBio's Form 10-KSB filed with the SEC on March 21, 2008.  The Form
10-KSB, which was signed by defendants Donnelly, Pusey, Schoettler, Hepler, Welch, and
McGonegal, contained additional statements regarding the importance to the Company of
developing and commercializing AppyScore and improper disclosures on the prospects of

the product. Particularly noteworthy is the claim regarding AppyScore's use in diagnosing *acute* appendicitis, as this is an interfering condition that must be ruled out for AppyScore to work due to the presence of septicemia in patients with acute appendicitis. The filing stated, in pertinent part:

> Using our proprietary protein purifying methods and other proteomic technologies, *we discovered several blood markers that appear to correlate with appendicitis in humans.*
>
> * * *
>
> *AppyScore is a one-of-a-kind appendicitis triage blood screening test, with no known competitors for patients entering an Emergency Room/Urgent Care facility complaining of abdominal pain.* Our product has the potential to greatly increase diagnosis accuracy, speed of diagnosis, reduce radiation exposure associated with CT Scanning and improve both the standard for care and patient outcomes while saving the U.S. health care system billions of dollars annually. We have received our Pre-IDE response from the FDA and are now pursuing a 510(k) (Pre-Market Notification) regulatory clearance *which we believe we will complete before the end of 2008*.
>
> * * *
>
> Based upon a potential annual emergency room/urgent care usage of 6 million tests and management's estimates of a sales price of a few hundred dollars per test with modest adoption, *the annual U.S. market potential for AppyScore and AppyScreen systems could exceed several hundred million dollars. We believe the international market potential for our appendicitis screen test systems will be a multiple of that of the U.S.*
>
> The Company continues to make progress in the development and testing of its two first-generation blood-based human diagnostic tests designed to rapidly help diagnose or rule out appendicitis in patients complaining of abdominal pain. Specifically, *we have created and optimized a specialized test to detect a marker in the blood associated with appendicitis* and have tested this assay in several on-going clinical research trials involving hundreds of human patients.
>
> *Preliminary results indicate that our first-generation ELISA triage/screen test is highly effective in identifying patients with acute appendicitis.* This marker demonstrates a linear (or direct) correlation with the severity of appendicitis. The test is especially accurate in patients 30 years of age and under, which is also the age group most commonly afflicted with appendicitis.

62.     On June 26, 2008, the Company announced in a press release that the AppyScore FDA clinical trial had commenced. In the press release, defendant Donnelly continued to improperly tout the utility, effectiveness, and value of AppyScore, despite his knowledge, or reckless lack thereof, that the product embodied none of those traits:

> ***The initiation of this clinical trial is a major milestone for AspenBio in our efforts to commercialize the first and only known blood test for human appendicitis and what has been heralded by analysts as a medical break-through.*** We are encouraged by the pilot results we have achieved to date, and we have great confidence in the highly experienced and professional team overseeing this trial process and FDA submission.

63.     On December 17, 2008, AspenBio issued a press release titled: "AspenBio Receives Patent Office Notice of Allowance for Appendicitis Diagnostic Methods." The press release reported that the USPTO had issued a Notice of Allowance for the Company's AppyScore-related patent application entitled "Methods and Devices for Diagnosis of Appendicitis," which was first published by the USPTO in February 2006. Defendant Donnelly was quoted in the press release as stating:

> This represents a major milestone in the development of our intellectual property for the appendicitis diagnostic technology. This official notice from the Patent Office represents a considerable achievement for our company and our goals. ***The issuance of this notice represents recognition of the patentability of our innovative technology and enhances the value of this important asset.***

The patent application is significant because in it the Company disclosed that AppyScore was based on the MRP 8/14 protein and that it could only be applied to patients without any of the other conditions associated with MRP 8/14. This fact, which disables AppyScore as a diagnostic tool for appendicitis, was known to the Individual Defendants, but not disclosed to shareholders.

**THE INDIVIDUAL DEFENDANTS CONTINUE TO MAKE IMPROPER STATEMENTS THAT DISTORT THE RESULTS OF APPYSCORE'S CLINICAL STUDY**

64.     On January 20, 2009, the Company issued a press release titled: "AspenBio Pharma Reports Preliminary Results of AppyScore(TM) Clinical Study."  The preliminary results were disappointing, including sensitivity of only 73% and specificity of 52%, both below expectations.  On January 20, 2009, the Company's stock fell 83%, from $7.63 to $1.30.

65.     AppyScore's poor preliminary clinical results were a red flag to any of the Individual Defendants who didn't previously know the truth regarding the inability of AppyScore to serve as an effective appendicitis diagnostic tool.   The Individual Defendants, however, continued to make improper statements concerning AppyScore.

66.     Despite the poor preliminary results, which were to be expected by the Individual Defendants given their knowledge of the true nature and shortcomings of AppyScore, defendant Donnelly continued to make improper optimistic statements regarding the test.  In the January 20, 2009 press release, Donnelly stated:

> We are encouraged the data from this study continues to support our longstanding belief that AppyScore, in conjunction with other standard diagnostic approaches, can provide a significant aid in the diagnosis of appendicitis.

67.     The following day, the Individual Defendants held a conference call to discuss the preliminary results.  Defendant Pusey led off the January 21, 2009 conference call with improper comments concerning the utility and value of AppyScore:

> Detailed analysis of the data continues and will continue for some time. We engaged our staff, Board, and several consultants to assist us while we worked through the weekend in an effort that culminated in the recent release. ***While the results were not what we expected, we remain confident that the test market molecule is a good predictor of appendicitis and will result in a very valuable breakthrough medical product***.

\* \* \*

The recent significant FDA trial continued to demonstrate what is showing consistently with literally thousands of blood and appendicitis samples we have historically tested. ***We have the correct marker and the test improves the current standard of care in the diagnosis of appendicitis***.

68.     Defendant Faulkner, who had just recently joined the Company, also chimed in regarding the Company and AppyScore.   In his initial comments, he highlighted some deficiencies he had identified at AspenBio.   However, instead of righting the ship by suggesting the Company change its focus to a product with real value and potential, he indicated the intent to stay the course with AppyScore and invest even more shareholder capital in building the Company around AppyScore:

That's all on the positive side of the ledger.

But I also found some things that we could do better. ***The organization is thin*** and as with a number of small companies that I see, several people are wearing several hats. As well as, and all well and good in low ambition companies, but when you have high ambitions, you must have the domain expertise and executive leadership equal to the challenges. The good news is that the Board has recognized this and began adding talent to the Board last year.

This really leads to the second thing. A function of spreading people too thin is that it potentially leads to gaps in execution versus expectations. ***We simply need to execute better***, not so much because we're doing things wrong, but because we have big ideas and big ambitions and we want to align our resources and efforts to achieve those expectations.

And last, ***I found a company that needs to communicate better***, with you, with the analysts, and others who follow our company. We simply need to improve our visibility with clear, honest, and a predictable communications rhythm.

Now, the good news here, all of these things are fixable. They are the kinds of things that attract employees and investors to great companies, and these things we'll do. The Board has been very clear in their expectations and supportive in early discussions about direction. In the coming days, I will address each of these foundational issues without diminishing those things we're doing well. In addition, ***we will aggressively pursue programs to get our strategic objectives back on track with the FDA-approved diagnostic` test that aids in the diagnosis of appendicitis. I see no reason that this is not still a very real event*** and I look forward speaking with you with progress reports along the way.

69. Another glaring red flag in the preliminary results was only unearthed in defendant Donnelly's response to a question posed by an analyst. Analyst Matthew Scalo questioned the Individual Defendants regarding site variations, an issue that would rear its head again in the later trial results announced in June 2010. On the conference call, Matthew Scalo wondered if there were any "center-specific" issues that might have impacted the data. In response, defendant Donnelly stated:

> And then, to answer your question on did we see any site variations. In our investigation, **we definitely zeroed in on one hospital that appeared to have some variation.**

This response represents an acknowledgment that the Individual Defendants were aware of the variability in AppyScore trial results, as expected given their knowledge of the true nature of the AppyScore test.

70. On March 12, 2009, despite the weak results in the AppyScore clinical trial, the Company issued a press release announcing AspenBio's intention to proceed with the FDA 510(k) application to seek clearance of AppyScore. The Individual Defendants held a conference call that same day, on which defendants Colgin and Faulkner made additional improper statements regarding the trial results and the prospects of AppyScore as a means and an instrument for the diagnosis of appendicitis.

71. On the conference call, defendant Colgin spoke to the site variation discussed in the January 21, 2009 conference call. Instead of explaining that variability should be expected given the substantial number of interfering conditions that render AppyScore ineffective in diagnosing appendicitis, Colgin instead chose to dismiss the variability essentially as a non-issue:

> Now, a significant contributing factor to this clinical sensitivity in the pivotal trial was unexpected variability and this was in the patient population at one particular site. And this site contributed about 30% of the total population of the study and had clinical characteristics which were markedly different than the other sites in the study. Additionally, results from this site were different than what would typically be expected based on

numerous other studies reported in the peer-reviewed literature. Let me give you a couple of examples.

\* \* \*

Our conclusion is that one site saw more mild cases of appendicitis and was more effective at diagnosing them. This site's patient population contribution to the overall trial was significant enough to alter the overall reported results of the study. While this site was – this one site was different, we have concluded, it was not due to an error or test variance. It was due to the unexpected patient population from that site.

72.     Defendant Faulkner followed up with additional improper statements expressing confidence in the AppyScore test:

In my first six weeks at Aspen ***I've seen nothing that has dampen my enthusiasm for the company and its mission to develop the world's first blood test aid in the diagnosis for appendicitis.*** I've been in the life sciences and medical devices industry for a long time and all worthwhile breakthroughs experience challenges in their development and adoption phases. ***AppyScore is no different in that regard***.

73.     Soon after the conference call, defendants Faulkner, Pusey, Schoettler, Hepler, Welch, Ratain, Merson, Landon, Caspari, McGonegal, and Colgin made improper statements in AspenBio's Form 10-K filed with the SEC on March 16, 2009.  The Form 10-K contained additional statements regarding the importance to the Company of developing and commercializing AppyScore and improper disclosures on the prospects of the product. The filing stated, in pertinent part:

Today, ***the Company is primarily focused on advancing towards commercialization, our recently patented blood-based human diagnostic test, AppyScore™ to aid in the diagnosis of human appendicitis*** and several novel reproduction drugs for use in high value animals.

\* \* \*

The Company continues to make progress in the development and testing of its first-generation blood-based human diagnostic tests designed to rapidly aid in the diagnosis of appendicitis in patients complaining of abdominal pain. ***Specifically, we have created and optimized a specialized test to detect a marker in the blood associated with appendicitis*** and have tested this assay in several clinical research trials involving hundreds of human patients.

> *Preliminary results indicate that our first-generation ELISA triage screen test is highly effective in identifying patients with acute appendicitis.* This marker demonstrates a strong correlation with the severity of appendicitis. As a result of these positive developments, the Company is advancing its appendicitis triage blood screen test AppyScore, which is based on a blood test result scoring system designed to be used as an initial appendicitis triage or screening test for patients entering an emergency department or urgent care facility complaining of abdominal pain.

74.  On June 30, 2009, the Company disclosed in a press release that it had filed its 510(k) notification for AppyScore with the FDA.  Then, on August 21, 2009, the Company issued a press release stating that the FDA had requested additional information related to the June 510(k) application.  In this press release the Individual Defendants reported that they had anticipated an FDA request for additional data, and had "proceeded proactively with certain additional analyses and testing, *including supplemental trial work*."

75.  The Company followed up regarding the supplemental trial through a press release issued on December 29, 2009, titled: "AspenBio Pharma Reports Progress on the Supplemental Clinical Trial, Work to Improve the Clinical Utility of AppyScore(TM) and Scheduled Meeting With FDA."  In the press release, the Company indicated that it was initiating interim trial data analysis.  Regarding the data expected to be gleaned from the supplemental trial, defendant Caspari stated:

> We have received a clear message from our outside clinical experts, which is supported by our Medical Advisory Board, that *the clinical value of AppyScore will be significantly enhanced* by data that demonstrate that AppyScore achieves a negative predictive value substantially higher than current diagnostic modalities when used in conjunction with other commonly ordered diagnostic tests. *We believe that taking the steps necessary to accomplish this objective will be well worth the time and costs and will result in added value*.

76.  Defendants Faulkner, Pusey, Schoettler, Hepler, Welch, Ratain, Merson, Landon, and McGonegal continued to make improper statements in AspenBio's Form 10-K filed with the SEC on March 9, 2010.  This Form 10-K contained additional statements

regarding the importance to the Company of developing and commercializing AppyScore and improper disclosures on the prospects of the product. The filing stated, in pertinent part:

> Today, **the Company is primarily focused on advancing towards commercialization our recently patented blood-based human diagnostic test, AppyScore™ to aid in the evaluation of acute appendicitis**, as well as several novel reproduction drugs for use in high value animals and livestock production.

> \* \* \*

> The Company continues to make progress in the development and testing of its first-generation blood-based human diagnostic test designed to aid in the evaluation of appendicitis in patients complaining of abdominal pain suspicious for appendicitis. Specifically, **we have created and optimized a specialized test to detect a marker in the blood associated with appendicitis** and have tested this assay in several clinical research trials involving hundreds of human subjects. This blood test is designed to be used to help physicians evaluate patients entering an emergency department or urgent care facility complaining of abdominal pain suspicious for acute appendicitis.

> **Preliminary results indicate that a positive result using our first-generation ELISA test is correlated with the likelihood of having acute appendicitis.** We believe that AppyScore has the potential to enhance the accuracy and speed of diagnosis and improve the standard of care for acute appendicitis. We anticipate that our appendicitis test, once cleared by the FDA, will be incorporated in routine blood testing as a patient's blood sample is taken in the ordinary course of an initial assessment of any patient entering the emergency department. Our appendicitis blood test system is designed to measure the blood marker level, which guides the physician in helping to determine if a patient is at a low risk for appendicitis. We believe this test will cost-effectively and accurately assist emergency room personnel and primary care physicians in evaluating patients complaining of abdominal pain suspicious for appendicitis.

77. On March 23, 2010, AspenBio issued a press release titled: "AspenBio Completes Patient Enrollment of AppyScore Clinical Trial to Support FDA 510(k) Submission." The press release indicated a timeline of approximately six to eight weeks until completion of the independent review and validation of the clinical data and analysis. In the press release, defendant Caspari stated:

This broad-based national trial, which collected blood samples from patients at thirteen major academic hospitals, represents **the most expansive and tightly controlled trial ever conducted for AppyScore**…. While at this point there can be no assurance the trial data will be sufficient to achieve FDA clearance of AppyScore, we believe **we are well positioned to demonstrate the benefits AppyScore brings to the evaluation of patients suspected of having acute appendicitis** in the emergency department setting.

78.     On March 25, 2010, the Company issued a press release announcing the addition of defendant Lundy as CEO and a member of the Board.   The press release contained improper statements made by Lundy.   Specifically, in reference to AppyScore, defendant Lundy stated:

My due diligence, including discussions with AspenBio board members and industry thought leaders have convinced me that **AppyScore has the potential to make a major impact on patient care**. I believe the company has positioned itself with technology, an intellectual property estate and a leadership team that are essential for success.

### THE TRUTH IS REVEALED

79.     Then, on June 7, 2010, AspenBio issued a press release titled: "AspenBio Pharma Updates on AppyScore(TM) FDA 510(k) Filing and Data Analysis."  In the press release, the Company disclosed that it was performing additional data analysis on the recent trial and would be delaying its 510(k) filing.   The press release also reported what the Individual Defendants knew or were reckless in not knowing would occur in the trial: that there was "unexplained variability" in the trial results from site to site.   Defendant Lundy commented further on the results in the press release:

**There is significant variability among clinical sites** that we must reconcile to fully understand the results…. Our commitment is to conduct a rigorous data analysis and we will report on this analysis as soon as we are able.

80.     On July 19, 2010, AspenBio reported complete results from the AppyScore trial.  The results showed a very low specificity of 16%, a result that shocked the public but should have come as little surprise to the Individual Defendants given their knowledge regarding the true nature of AppyScore.

81.     Due to the Individual Defendants' improper statements, the Company's market value rose to nearly $420 million during the relevant period.  By the time the full truth regarding AppyScore's inherent inability to serve as a means and instrument for the diagnosis of appendicitis came to light, AspenBio's value had collapsed to less than $28 million, erasing nearly $392 million, or over 93% over the Company's market value.

## THE MATERIALLY MISLEADING PROXY STATEMENTS

82.     AspenBio's Annual Proxy Statements filed with the SEC on Form DEF 14A on or about April 29, 2008 (the "2008 Proxy Statement") and October 16, 2009 (the "2009 Proxy Statement") (collectively, the "Proxy Statements") were materially inaccurate in that they failed to disclose numerous highly material facts and circumstances.   The materially inaccurate Proxy Statements caused direct harm to the Company in that, among other things, the Defendants' omissions perpetuated the systematic misconduct within the Company, which brought about the severe damages to which the Company has been and will continue to be subjected, as well as through the creation of compensation obligations by the Company that would not have existed but for the materially inaccurate and incomplete Proxy Statements.

83.     Each of these Proxy Statements included the AspenBio "Annual Report" on Form 10-K or Form 10-KSB for the previous year.  Specifically, the 2008 Proxy Statement included AspenBio's 2007 Annual Report (the "2007 Annual Report") on Form 10-KSB for the year ended December 31, 2007; and the 2009 Proxy Statement included AspenBio's 2008 Annual Report (the "2008 Annual Report," and with the 2007 Annual Report, the "Annual Reports") on Form 10-K for the year ended December 31, 2008.  AspenBio's Annual Reports are published annually and are the principal documents through which information concerning the Company's operations and financial condition are publicly disclosed.  Each of the Annual Reports included, inter alia, a detailed narrative concerning AspenBio's ongoing business operations (including the improper statements alleged herein concerning the prospects of AppyScore as a means and instrument for the diagnosis of

appendicitis), the Company's consolidated financial statements, and the notes to the Company's consolidated financial statements. These disclosures thus, formed a part of the Proxy Statements and were a critical element of the solicitation embodied in the Proxy Statements.

84.     Each of the Proxy Statements was intended to, and did, procure AspenBio's shareholders' votes with respect to matters materially affecting the Company that legally required shareholder approval. Both Proxy Statements sought and obtained election of the Director Defendants by shareholder vote, in each case upon the Board's explicit recommendation as to which directors should be elected. In addition, both Proxy Statements sought and obtained shareholder approval to amend the 2002 Stock Incentive Plan to increase the number of shares available under the plan for stock option grants to the Company's employees, executives, and directors. The Board portrayed the amendments to the 2002 Stock Incentive Plan as a necessary increase in potential compensation to reward high-performing employees, officers, and outside directors.

85.     Each of the Director Defendants was duty-bound pursuant to his or her general fiduciary duties under Delaware law and by the provisions of federal securities laws to fully disclose all information material to shareholders' decision concerning how to cast their votes in connection with the election of Board members in 2008 and 2009 and with respect to their decision whether to vote to approve the massive potential compensation increases embodied in the amendments to the 2002 Stock Incentive Plan.

86.     The Director Defendants knew or were reckless in not knowing that AppyScore is completely nonspecific for appendicitis and as a result is inherently flawed as a means and instrument for the diagnosis of appendicitis. Nonetheless, the Director Defendants included in the Proxy Statements the amendments to the 2002 Stock Incentive Plan to increase the number of shares available under the plan, for which defendants sought and obtained shareholder approval. At the same time, the Individual Defendants had shifted AspenBio's business to focus the vast majority of its resources on AppyScore,

including nearly 75% of the Company's research and development budget, or $10.7 million, as well as millions of additional dollars in compensation and administrative expenses directly related to AppyScore. The Individual Defendants were simultaneously making improper statements concerning the prospects for AppyScore. Thus, the Director Defendants' portrayal of these increases as necessary to reward high-performing employees, officers, and outside directors came with the implication that such rewards were tied to the development of AppyScore, an inherently ineffective tool for diagnosing appendicitis.

87. The 2002 Stock Incentive Plan, and the amendments thereto, were particularly lucrative to the Company's directors since they were provided with an annual grant of 50,000 stock options. In addition, each and every one of the Individual Defendants received at least 100,000 stock options under the plan during the relevant period. In fact, while perpetuating the improper course of action described herein, the Individual Defendants essentially awarded themselves every additional share approved for the 2002 Stock Incentive Plan by the Company's shareholders.

88. In total, the false and misleading Proxy Statements caused the shareholders to approve an aggregate of 1,850,000 additional shares for the 2002 Stock Incentive Plan, including: (i) an additional 350,000 shares in the 2008 Proxy Statement; and (ii) an additional 1,500,000 shares in the 2009 Proxy Statement. The Individual Defendants used these additional shares that they had misled the Company's shareholders into approving to directly benefit themselves. Indeed, during the relevant period and subsequent to the approval of the additional shares described above, the Individual Defendants granted themselves a total of 2,457,709 stock options under the 2002 Stock Incentive Plan - 607,709 more than the number of additional shares the plan had been amended to allow. The following table illustrates these stock option awards received by the Individual Defendants under the 2002 Stock Incentive Plan:

| Stock Option Recipient | Grant Date | Number of Stock Options Granted |
|---|---|---|
| Merson | 7/1/2008 | 65,674 |
| Landon | 12/19/2008 | 67,035 |
| Faulkner | 1/26/2009 | 500,000 |
| Colgin | 1/27/2009 | 50,000 |
| Donnelly | 1/27/2009 | 50,000 |
| Hepler | 1/27/2009 | 50,000 |
| Landon | 1/27/2009 | 50,000 |
| McGonegal | 1/27/2009 | 50,000 |
| Merson | 1/27/2009 | 50,000 |
| Pusey | 1/27/2009 | 50,000 |
| Ratain | 1/27/2009 | 50,000 |
| Schoettler | 1/27/2009 | 50,000 |
| Welch | 1/27/2009 | 50,000 |
| Caspari | 2/10/2009 | 300,000 |
| Caspari | 1/19/2010 | 50,000 |
| Colgin | 1/19/2010 | 50,000 |
| Faulkner | 1/19/2010 | 125,000 |
| Hepler | 1/19/2010 | 50,000 |
| Landon | 1/19/2010 | 50,000 |
| McGonegal | 1/19/2010 | 50,000 |
| Merson | 1/19/2010 | 50,000 |
| Pusey | 1/19/2010 | 50,000 |
| Ratain | 1/19/2010 | 50,000 |
| Schoettler | 1/19/2010 | 50,000 |
| Welch | 1/19/2010 | 50,000 |
| Lundy | 3/24/2010 | 400,000 |
| TOTAL: | | 2,457,709 |

89.     Despite its obligations under fiduciary duty and the federal securities laws, the Board caused the Company to file and disseminate the materially inaccurate Proxy Statements.  Specifically, in AspenBio's definitive Proxy Statements, defendants provided materially misleading information and disclosures concerning the Company, the general responsibilities of the Board and its committees, the basis for the approval of additional shares for the 2002 Stock Incentive Plan, and the basis upon which the members of the Board were seeking election to another term of office.   The Proxy Statements were materially inaccurate and incomplete because, among other things, the Individual Defendants failed to disclose that AppyScore was fundamentally disabled as a means and instrument for the diagnosis of appendicitis due to its lack of specificity in diagnosing the condition.

90. In light of defendants' material omissions from the Proxy Statements, the votes and the consequent election of directors to the Board were obtained on the basis of inaccurate disclosures. Had shareholders been provided with complete and accurate information concerning the Board's performance of its duties – including with respect to presiding over the Company's extensive misuse of funds to support the development of a product with no real commercial prospects – the members of the Board would not have been reelected.

91. The reelection of the Director Defendants inflicted significant harm on the Company. This reliance on the Board's assumption of duty caused the direct detriment of the Company, which, in the absence of the Board's fulfillment of its obligations, was left helpless to prevent the misconduct occurring during the relevant period. The consequent damages to the Company were a direct result of the Board's perpetuation of this misconduct, which was made possible by the materially inaccurate and incomplete statements that caused defendants' election to the Board. But for the Board's refusal to carry out its duties, the harm that befell the Company would not have occurred.

92. Further, shareholders would not have voted in favor of the amendments to the 2002 Stock Incentive Plan but for the materially misleading Proxy Statements. Had shareholders been provided with complete and accurate disclosures, they would have been made aware that the Individual Defendants would award essentially all of the additional shares to themselves and that the Company was wasting millions on the commercially unviable AppyScore. AspenBio shareholders would have chosen not to increase the number of shares allowable for the compensation of employees, officers, and directors who were damaging the Company, and thereby rewarding them for their improper activity. Rather, AspenBio's shareholders would have instead demanded that appropriate legal action be taken against those employees, officers, and outside directors who participated in this widespread misconduct. Shareholders' approval of the amendments to the 2002 Stock Incentive Plan likewise harmed the Company by drawing off 1.85 million shares of stock

directly from the Company in order to offer lavish compensation to senior executives and others at AspenBio—including the outside directors—in return for engaging in the extensive misconduct described herein.

93.    Accordingly, AspenBio has been damaged by the materially inaccurate statements and omissions in the Proxy Statements that procured the reelection of defendants to the Board, thus perpetuating their misconduct, as well as shareholders' approval for an increase in shares available for granting to employees, officers, and outside directors who had been involved in wide-ranging misconduct – a proposal that would have been rejected had the true facts been disclosed to shareholders.

### THE INDIVIDUAL DEFENDANTS KNOWLEDGE THAT APPYSCORE WAS INHERENTLY INEFFECTIVE IN DIAGNOSING APPENDICITIS

94.    The Director Defendants' improper statements concerning AppyScore were made despite their knowledge, or reckless lack thereof, that the AppyScore MRP 8/14 test was inherently incapable of accomplishing its stated purpose.  The Officer Defendants' improper statements concerning AppyScore were made despite their knowledge, reckless lack thereof, or with gross negligence that the AppyScore MRP 8/14 test was inherently incapable of accomplishing its stated purpose.  Throughout the relevant period, the Individual Defendants touted AppyScore as a novel diagnostic tool with the potential to reach a $1 billion annual market.  The Individual Defendants went so far as to say that AppyScore was not only a blockbuster development for the Company, but for the healthcare industry as a whole.

95.    In truth, AppyScore, in measuring MRP 8/14, is completely nonspecific for appendicitis.  This fact was disclosed in the Company's AppyScore patent filings with the USPTO.  These filings reported that AppyScore could only be effectively used on patients without a number of interfering conditions, conditions which can not be ruled out in AppyScore's intended emergency room setting.  As such, AppyScore is essentially useless as a tool for the diagnosis of appendicitis especially in an emergency room setting.

Because these facts were disclosed in the Company's USPTO filings, the Director Defendants knew, or at a minimum were reckless in not knowing and the Officer Defendants either knew, were reckless, or at a minimum were grossly negligent in not knowing that that AppyScore was inherently ineffective in diagnosing appendicitis. As a result, the Individual Defendant's relevant period statements regarding AppyScore's prospects were improper when made.

### THE BOARD HARMS ASPENBIO BY HAVING IT BUYBACK ITS STOCK

96. During the relevant period, AspenBio purchased nearly $1 million of its own stock. These repurchases of the Company's stock, however, were at artificially inflated prices as a result of the improper public statements, press releases, and SEC filings that misrepresented the prospects of AppyScore as a means and instrument for the diagnosis of appendicitis. As shown above, each of the Individual Defendants knew, or was reckless in not knowing, that the information the Company was disclosing concerning AppyScore was improper when made.

97. The following chart illustrates the average prices paid for the Company's common stock during the repurchase period:

| Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|
| April 25-30, 2008 | 175,000 | $4.29 | $750,750.00 |
| May 1-31, 2008 | 22,000 | $4.17 | $91,740.00 |
| June 1-30, 2008 | 35,000 | $4.27 | $149,450.00 |
| | **232,000** | | **$991,940.00** |

98. Under the defendants' authorization, the Company bought back nearly $1 million worth of its shares at a weighted average price of $4.28. Tellingly, the weighted average repurchase price was substantially higher than AspenBio's share price when its true business health was fully revealed, dropping the Company's stock price to $0.69 per share on July 20, 2010. This drop completed the removal of the inflation from AspenBio's stock

price, causing real economic loss to the Company, which, at the Individual Defendants' direction, had repurchased stock during this time period.

99.     The Individual Defendants caused AspenBio to waste hundreds of thousands of dollars on stock repurchases. Because the price of the Company's shares was artificially inflated by way of the Individual Defendants' concealments and misrepresentations, the Company, unbeknownst to shareholders, materially overpaid for its own stock. The stock repurchases improperly signaled to AspenBio's shareholders and the public that the purchase of the Company's stock at those prices was the best use of the Company's cash. In reality, however, AspenBio's stock price was inflated as a result of the Individual Defendants' improper public statements.

## DAMAGES TO ASPENBIO

100.     As a result of the Individual Defendants' wrongful conduct, AspenBio made improper statements, and/or failed to disclose material information. Moreover, the Company disseminated improper statements concerning AppyScore's prospects as a means and instrument for the diagnosis of appendicitis. These collective improper statements have devastated AspenBio's credibility as reflected by the Company's loss of nearly $392 million, or 93%, in market capitalization.

101.     Additionally, AspenBio is now the subject of shareholder class actions alleging securities laws violations in connection with the improper statements. The Company will face substantial costs in connection with these lawsuits.

102.     Further, as a direct and proximate result of the Individual Defendants' conduct, AspenBio has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred in unnecessary research and development on AppyScore;

(b)     costs incurred from recruiting and compensating Company personnel admittedly hired for purposed of supporting AppyScore;

(c)      costs incurred in investigating and defending AspenBio and certain officers and directors in the class action lawsuits alleging federal securities law violations, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

(d)      costs incurred from repurchasing nearly $1 million of AspenBio stock at artificially inflated prices; and

(e)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to AspenBio.

103.    Moreover, these actions have irreparably damaged AspenBio's corporate image and goodwill. For at least the foreseeable future, AspenBio will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that AspenBio's ability to raise equity capital or debt on favorable terms in the future is now impaired. The impairment of a development stage company like AspenBio's ability to raise capital on favorable terms is a significant adverse development for the Company, as it depends on raising new capital to support the development of its products.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

104.    Plaintiff brings this action derivatively in the right and for the benefit of AspenBio to redress injuries suffered, and to be suffered, by AspenBio as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. AspenBio is named as a nominal defendant solely in a derivative capacity.

105.    Plaintiff will adequately and fairly represent the interests of AspenBio in enforcing and prosecuting its rights.

106.    Plaintiff was a shareholder of AspenBio at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current AspenBio shareholder.

107. The current Board of AspenBio consists of the following nine individuals: defendants Faulkner, Hepler, Landon, Lundy, Merson, Pusey, Ratain, Schoettler, and Welch. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

108. Defendants Pusey and Faulkner breached their fiduciary duties of care and loyalty by making improper statements in the Company's press releases and conference calls. Therefore, defendants Pusey and Faulkner face a substantial liability for their breaches of duties. Any demand upon defendants Pusey and Faulkner is futile.

109. Defendants Faulkner, Pusey, Lundy, Ratain, and Schoettler are all named as defendants in a securities class action that alleges violations of sections 10(b) and 20(a) of the Exchange Act (the "Securities Class Action"). Further, since this action alleges as a basis for liability many of the same improper statements as does the Securities Class Action, Faulkner, Pusey, Lundy, Ratain, and Schoettler and the remainder of AspenBio's Board are too hopelessly conflicted to make an independent determination related to the subject matter of this litigation. If AspenBio pressed forward with its rights of action against the defendants in the Securities Class Action, the Company's efforts would undercut or compromise Faulkner, Pusey, Lundy, Ratain, and Schoettler's defense as well as AspenBio's defense in the Securities Class Action. Therefore, a demand on the Board is futile.

110. Defendants Faulkner, Hepler, Landon, Merson, Pusey, Ratain, Schoettler, and Welch, each a member of the Board, bear a substantial likelihood of liability arising from their violation of the federal securities laws in connection with their issuance of the Proxy Statements. The Proxy Statements constituted solicitations by these Director Defendants, as applicable, for which they may be held personally liable under the federal securities laws. As set forth herein, the Proxy Statements were materially inaccurate and incomplete, which caused significant harm to the Company. As a result, these Director Defendants each bear a substantial likelihood of liability for their violations of the federal

securities laws, are hopelessly conflicted and not disinterested with respect to such claims, and are, fundamentally disabled from impartially considering a demand to impose liability on themselves for violating their own statutory disclosure obligations.

111.    Defendants Pusey, Faulkner, Schoettler, Hepler, Welch, Ratain, Merson, and Landon breached their fiduciary duties of loyalty and good faith by making improper statements in AspenBio's Forms 10-K and 10-KSB during the relevant period. These statements were improper because they knowingly or recklessly failed to disclose the truth about AppyScore – that it is inherently ineffective as a means and instrument for the diagnosis of appendicitis. Thus, defendants Pusey, Faulkner, Schoettler, Hepler, Welch, Ratain, Merson, and Landon face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith, so any demand upon them is futile.

112.    The members of the Board knew or were reckless in not knowing the true facts about AppyScore's dismal prospects as a means and instrument for the diagnosis of appendicitis. AspenBio has spent years and extensive funds in the research and development of AppyScore. After years and tens of millions of dollars spent, the Company appeared, at least publicly, to be on the brink of success with the Company's core product—its only product with any realistic hope of producing material revenues for AspenBio. AppyScore was undoubtedly vital to the Company's profitability and survival.

113.    Defendants Faulkner, Hepler, Landon, Lundy, Merson, Pusey, Ratain, Schoettler, and Welch, as AspenBio directors, were responsible for overseeing and monitoring the Company's clinical trials, pre-clinical studies, and development of AppyScore, and were aware or reckless in not being aware of its inherent inability to function as an effective appendicitis diagnostic tool. The Company's Corporate Governance Guidelines specifically provided for the directors to "evaluate[] AspenBio's overall strategy and monitor[] AspenBio's performance…." Developing AppyScore was the major aspect of the Company's strategy, and AppyScore's Board was responsible for evaluating and monitoring its progress and potential. For the reasons discussed in detail

above, the Individual Defendants knew about, among other things, the non-specificity issues in AspenBio's principal product that severely damaged the test's chances of receiving FDA approval and becoming marketable and profitable. When they became aware that AppyScore was designed to measure MRP 8/14 and thus, was completely nonspecific for appendicitis, the directors were duty-bound to act and to ascertain both the true status of its development and the veracity of the statements the Company was issuing during that critical time period. The Board members knew that the shortcomings of AppyScore existed and should have been disclosed to the public. Indeed, this information was disclosed to the USPTO in the Company's patent applications for AppyScore. Despite their knowledge that AppyScore was completely nonspecific in the diagnosis of appendicitis and thus, could not serve as an effective appendicitis diagnostic tool, defendants Faulkner, Hepler, Landon, Lundy, Merson, Pusey, Ratain, Schoettler, and Welch failed to direct the Company to disclose the truth about AppyScore's inability to serve as a tool for diagnosing appendicitis. Because the entire Board consciously and knowingly caused or permitted AspenBio to mislead the public, the members of the Board face a substantial likelihood of liability. Thus, demand is excused.

114. The Audit Committee Defendants, Hepler, Schoettler, Welch, and Merson, were members of the Audit Committee. The Audit Committee's Charter provides that it is responsible for reviewing the Company's annual financial statements, internal controls, and legal compliance. Thus, the Audit Committee Defendants were responsible for overseeing and directly participating in the dissemination of AspenBio's improper statements in its Forms 10-K and 10-KSB. Despite these duties, the Audit Committee Defendants approved the dissemination of the improper statements alleged above. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty by participating in the preparation of financial statements that contained improper information. The Audit Committee Defendants' approval of the improper statements was not a good faith exercise of their business judgment. Moreover, the Audit Committee Defendants face a substantial

likelihood of liability for their breach of fiduciary duties. Accordingly, any demand upon the Audit Committee Defendants is futile.

115. Further, the Audit Committee's Charter provides that it is responsible for risk assessment, including "areas of potential significant financial risk to the Company." The Company's development of AppyScore was a major risk that the Board monitored or should have monitored. For the reasons discussed in detail above, the Individual Defendants knew about, among other things, the non-specificity issues in AspenBio's principal product that severely damaged the test's chances of receiving FDA approval and becoming marketable and profitable. As such, they knew the financial risk the Company was taking in the development of AppyScore was a losing gamble. Despite this knowledge and their duties to assess AspenBio's significant risks, the Audit Committee Defendants approved the improper statements alleged above. Accordingly, the Audit Committee Defendants breached their fiduciary duties by approving improper statements and failing to exercise their "significant financial risk" oversight responsibilities. Moreover, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties. Accordingly, any demand upon the Audit Committee Defendants is futile.

116. Defendants Pusey, Hepler, Schoettler, Welch, and Ratain breached their fiduciary duties of loyalty and care by allowing the Company to improperly buy back its own shares at artificially inflated prices. These actions caused AspenBio to materially overpay for its own stock, wasting hundreds of thousands of dollars of the Company's funds. Defendants Pusey, Hepler, Schoettler, Welch, and Ratain knew that the Company's stock price was artificially inflated while the Company continued to improperly repurchase nearly $1 million of its own stock. Accordingly, defendants Pusey, Hepler, Schoettler, Welch, and Ratain's decision to permit the Company to continue its repurchase is not protected by the business judgment rule. Further, these defendants face a substantial likelihood of liability for breach of their fiduciary duties of loyalty. Thus, any demand upon defendants Pusey, Hepler, Schoettler, Welch, and Ratain is futile.

117.    The principal professional occupation of defendant Pusey is his employment with AspenBio as its Vice President, Investor Relations, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits despite his failure to generate any significant revenue or profits for the Company.   Thus, defendant Pusey lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action. AspenBio paid defendant Pusey the following compensation:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|------|--------|---------------|----------------------------------------|------------------------|
| 2009 | $150,000 | $54,800 | $38,000 | $18,390 |
| 2008 | $150,000 | $195,400 | - | $20,613 |
| 2007 | $100,000 | $117,450 | $125,000 | - |

118.    The principal professional occupation of defendant Lundy is his employment with AspenBio as its CEO and President, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits despite his failure to generate any significant revenue or profits for the Company.   Under his employment agreement dated March 24, 2010, Lundy is entitled to an annual base salary of $275,000, an annual target bonus of $123,750, and other valuable benefits including stock-based incentive compensation.   Thus, defendant Lundy lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

119.    Defendants Pusey, Schoettler, and Welch have substantial long-standing business and personal relationships among themselves and with defendant McGonegal. These relationships create a reasonable doubt as to whether they can fairly and objectively consider a demand against one another.   These disabling relationships include:

(a)    Defendants Pusey, Schoettler, Welch, and McGonegal all served together at PepperBall Technologies, Inc. (f/k/a Security With Advanced Technology, Inc. ("SWAT"), f/k/a A4S Security, Inc.) ("PepperBall") from 2006 to 2009.   Pusey and

McGonegal served together at PepperBall from 2003 to 2009, with Pusey serving as Chairman of the Board and Secretary and McGonegal serving as President, CEO, and CFO at various times.

(b)     Defendants Pusey, Welch, and McGonegal all served together at Bactolac Pharmaceutical, Inc. ("Bactolac"), a company engaged in the formulation, manufacture, coating, and packaging of vitamin and nutritional tablets and powder, from 2003 through 2006.   Further, Pusey and McGonegal have worked closely together at Bactolac in various executive and/or director positions from 2000 to the present.

(c)     Defendants Pusey and McGonegal have worked side by side at Cambridge Holdings, Ltd. ("Cambridge") for over a decade.   Pusey, who controls Cambridge, is a director of Cambridge and has been since 1982 and President and Treasurer and has been since the mid-90's.   McGonegal is Cambridge's Senior Vice President of Finance and has been since at least 2002 and Secretary and a director and has been since at least 2000.   Cambridge was involved in the early financing of AspenBio as well as PepperBall.

As such, a reasonable doubt exists as to the ability or inclination of defendants Pusey, Schoettler, and Welch to make an independent demand determination as to each other and defendant McGonegal.   Demand on defendants Pusey, Schoettler, and Welch is therefore futile.

120.     Additionally, defendants Faulkner and Landon share a common business background and, with respect to AspenBio, Landon was responsible for paving the way for Faulkner to join the Company.   Upon Faulkner's joining the Company, he stated:

> *I was introduced to AspenBio by John Landon*, who joined the Board and was announced in December. You previously heard that *John and I had worked together at Digene*, where I was the CEO and a member of the Board, and he was a longstanding and highly respected member of that Board.

As such, more than a reasonable doubt exists as to the ability or inclination of defendants Faulkner and Landon to make an independent demand determination as to each other. Demand on defendants Faulkner and Landon is therefore futile

121.     Defendants Faulkner, Hepler, Landon, Lundy, and Ratain each had substantial scientific or medical backgrounds and expertise, from which they did or should have understood the inherent inability of AppyScore to function as an effective appendicitis diagnostic tool.   Despite their backgrounds, expertise, and experience, these defendants failed to disclose the truth about AppyScore and allowed improper statements concerning its prospects as a tool for diagnosing appendicitis.   In particular, these defendants had the following expertise:

(a)     Faulkner is described in the Company's SEC filings as having "significant chief executive and senior executive experience in medical device and medical diagnostics publicly traded companies, both national and global."   Indeed, Faulker has over twenty-five years of experience in the development and commercialization of molecular diagnostics, medical devices, drug and drug delivery systems, and life science research tools.   From 1998 to 2006, Faulkner served in various senior leadership roles with Invitrogen, a leading developer, manufacturer, and marketer of research tools in reagent, kit, and high-throughput application forms to customers engaged in life sciences research, drug discovery, diagnostics, and the commercial manufacture of biological products. Faulkner also served for fifteen years in various leadership positions at Abbott Laboratories.   Most recently, Faulkner served as President and CEO of Digene Corporation ("Digene")  a molecular diagnostics company that developed, manufactured, and marketed proprietary gene-based testing systems, and is now merged with Qiagen N.V. ("Qiagen").

(b)     Hepler is described in the Company's SEC filings as having "pharmaceutical and regulatory experience at the executive level."   Hepler is a formally trained scientist with a B.S. in biology, a B.S. in microbiology, and a Ph.D. in immunology. From at least March 2004 to April 2006, Hepler was Vice President of Research and

Development for IDEXX Pharmaceuticals, Inc. Prior to joining IDEXX, Hepler co-founded and served as Executive Vice President of Blue Ridge Pharmaceuticals, Inc., where he was instrumental in the development and FDA registration of numerous products.

(c)     Landon is described in the Company's SEC filings as having "extensive executive experience in the life science industry, with particular experience with medical products businesses." Landon spent over thirty years with the DuPont Company, including as Vice President and General of medical products, where he was responsible for all of DuPont's medical products businesses. Landon also served as a director of Digene, a molecular diagnostics company that developed, manufactured, and marketed proprietary gene-based testing systems, from 1997 until its 2007 merger with Qiagen. Landon has a B.S. in Chemical Engineering.

(d)     Lundy is described in the Company's SEC filings as having "over 20 years' experience in drug and diagnostic development companies, including experience leading the commercial launch of diagnostic products." Lundy was most recently CEO of MicroPhage, a leader in rapid bacterial diagnostics, in both bacterial identification and antibiotic susceptibility/resistance testing, through its bacteriophage-based amplification platform for immunoassay diagnostics, from 2008 to 2010. Lundy also served from 2003 to 2007 as a Vice President of GeneOhm, a division of Becton, Dickinson and Company Diagnostics, where he led the successful commercial launches of several novel molecular diagnostic assays.

(e)     Ratain is described in the Company's SEC filings as having "medical practice expertise and previous public company board experience." Indeed, Ratain has a degree in biochemical sciences from Harvard University and an M.D. from Yale University School of Medicine. In medicine, Ratain serves as a hematologist, oncologist, and a clinical pharmacologist. Ratain is a professor of medicine at the University of Chicago, where he has been associated with the Department of Medicine since 1983. From 1998 to

2008, Ratain served as a director of DATATRAK International, Inc., a company that provides services to entities engaged in clinical trials.

122.   Moreover, the acts complained of constitute violations of the fiduciary duties owed by AspenBio's officers and directors and these acts are incapable of ratification.

123.   Each of the defendant directors of AspenBio authorized and/or permitted the improper statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

124.   AspenBio has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves for that wrongful conduct to attempt to recover for AspenBio any part of the damages AspenBio suffered and will suffer thereby.

125.   If AspenBio's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of AspenBio.   However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by AspenBio against these defendants, known as the "insured versus insured exclusion."   As a result, if these directors were to cause AspenBio to sue themselves or certain of the officers of AspenBio, there would be no directors and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.

If there is no directors and officers' liability insurance, then the current directors will not cause AspenBio to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

126.     Moreover, despite having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for AspenBio for any of the wrongdoing alleged by plaintiff herein.

127.     Plaintiff has not made any demand on the shareholders of AspenBio to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     AspenBio is a publicly held company with over forty million shares outstanding and potentially thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

**Against Defendants Faulkner, Hepler, Landon, Merson, Pusey, Ratain, Schoettler, Welch, and Donnelly for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder, Based Upon Material Misstatements in and Omissions from AspenBio's Proxy Statements**

128.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.     Defendants Faulkner, Hepler, Landon, Merson, Pusey, Ratain, Schoettler, Welch, and Donnelly caused AspenBio to issue the Proxy Statements to solicit shareholder votes for the amendments to the 2002 Stock Incentive Plan and for the election of directors.

130.     As alleged in detail above, the Proxy Statements contained materially inaccurate and incomplete disclosures, including by omitting to disclose that AppyScore is

completely nonspecific for appendicitis and, as a result, is inherently flawed as a means and instrument for the diagnosis of appendicitis.

131.    The inaccuracies and omissions in each of the Proxy Statements concerned matters of material importance to the Company and were material to shareholders in response to the solicitations embodied in each of the Proxy Statements.  The Proxy Statements were an essential link in defendants' conscious disregard for AppyScore's fundamental disability to function as an effective tool for the diagnosis of appendicitis, as disclosure to the shareholders of the truth would have brought an end to the shareholders' endorsement of defendants Faulkner, Hepler, Landon, Merson, Pusey, Ratain, Schoettler, Welch, and Donnelly as fiduciaries and termination of the Company's compensation policies.

132.    The failure of defendants Faulkner, Hepler, Landon, Merson, Pusey, Ratain, Schoettler, Welch, and Donnelly to include these material facts in the Proxy Statements rendered the Proxy Statements materially inaccurate and incomplete, in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

133.    As a direct and proximate result of the issuance of the materially inaccurate and incomplete Proxy Statements, AspenBio suffered direct and significant damages in the form of, inter alia, the perpetuation of the widespread misconduct committed during the relevant period, substantial costs for unnecessary research and development and personnel recruitment and compensation associated with AppyScore, the improper buyback, and substantial additional liabilities related to the pending securities class action lawsuits and other potential lawsuits and investigations, as well as significant expenses related thereto. The Company was also directly damaged by the enactment of the amendments to the 2002 Stock Incentive Plan, which enactments were likewise solicited by the materially inaccurate and incomplete Proxy Statements.

134.    In connection with the improper acts alleged under this Count, defendants Faulkner, Hepler, Landon, Merson, Pusey, Ratain, Schoettler, Welch, and Donnelly

directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, or the facilities of a national securities exchange.

135.    This Count is only alleged against defendants Faulkner, Hepler, Landon, Merson, Pusey, Ratain, Schoettler, Welch, and Donnelly as to those proxies that were issued during their terms as directors on the Board.

## COUNT II

### For Breach of Fiduciary Duty Against the Individual Defendants

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.    As alleged in detail herein, the Individual Defendants, either by reason of their positions as officers and directors of AspenBio or because of their ability to control the business and corporate affairs of AspenBio, owed AspenBio fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage AspenBio in a fair, just, honest, and equitable manner.

138.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company by failing to disclose that AppyScore is inherently nonspecific, and thus, cannot be used as an effective means and instrument for the diagnosis of appendicitis. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

139.    Defendants Faulkner, Hepler, Landon, Merson, Pusey, Ratain, Schoettler, and Welch breached their duty of loyalty by knowingly or recklessly omitting material information from the Proxy Statements.

140.    Defendants Pusey, Faulkner, Schoettler, Hepler, Welch, Ratain, Merson, Landon, Caspari, Lundy, McGonegal, Colgin, and Donnelly owed AspenBio the highest duty of loyalty. These defendants breached their duty of loyalty by making or approving

improper statements related to AppyScore's prospects as an effective means and instrument for the diagnosis of appendicitis. Defendants Pusey, Faulkner, Schoettler, Hepler, Welch, Ratain, Merson, Landon, Caspari, Lundy, McGonegal, Colgin, and Donnelly all made improper statements in press releases, conference calls, and/or filings with the SEC, including the Company's Forms 10-K and/or 10-KSB.

141. Defendants Hepler, Schoettler, Welch, and Merson reviewed and approved improper statements regarding AppyScore's prospects as an effective means and instrument for the diagnosis of appendicitis. Additionally, this constituted a violation of the duties of the members of the Audit Committee under its respective Charter.

142. Defendants Pusey, Schoettler, Hepler, Welch, McGonegal, Colgin, and Donnelly caused or allowed the Company to cease attempting to identify a novel marker for appendicitis and to instead shift to MRP 8/14. Accordingly, AspenBio developed AppyScore to measure MRP 8/14, despite defendants Pusey, Schoettler, Hepler, Welch, McGonegal, Colgin, and Donnelly's knowledge or reckless lack thereof that this test is completely nonspecific for appendicitis and thus, inherently incapable of serving as an appendicitis diagnostic tool.

143. The Officer Defendants caused the Company to shift its focus to the development of AppyScore, despite their knowledge or reckless lack thereof that AppyScore was fundamentally flawed as a means and instrument for the diagnosis of appendicitis. The result of the Officer Defendants' actions was the diversion of tens of millions of AspenBio's funds towards a product with almost no chance of commercial success. Additionally, the Officer Defendants made improper statements regarding AppyScore's prospects as an appendicitis diagnostic tool. Accordingly, the Officer Defendants breached their duty of care.

144. Defendants Pusey, Hepler, Schoettler, Welch, and Ratain authorized and allowed the Company to improperly buy back nearly $1 million worth of its own shares at prices they knew or were reckless in not knowing were artificially inflated by the improper

statements detailed herein. Accordingly, defendants Pusey, Hepler, Schoettler, Welch, and Ratain breached their fiduciary duty of loyalty.

145. But for the abdication of the Individual Defendants' fiduciary duties, the Company would not have been damaged. Accordingly, all of the Individual Defendants breached their fiduciary duties.

146. As a direct and proximate result of Individual Defendants' failure to perform their fiduciary obligations, AspenBio has sustained significant damages, as alleged herein. As a result of the misconduct allege herein, these defendants are liable to the Company.

147. Plaintiff, on behalf of AspenBio, has no adequate remedy at law.

## COUNT III

### For Waste of Corporate Assets Against the Individual Defendants

148. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) approving the repurchase of nearly $1 million of the Company's stock at artificially inflate prices; (ii) incurring tens of millions of dollars in unnecessary research and development and personnel costs; (iii) paying undeserved compensation to certain of its executive officers and directors; and (iv) incurring potentially millions of dollars in legal liability and/or legal costs to defend defendants' unlawful actions.

150. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

151. Plaintiff, on behalf of AspenBio, has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Unjust Enrichment

152. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of AspenBio. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to AspenBio.

154. Plaintiff, as a shareholder and representative of AspenBio, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

155. Plaintiff, on behalf of AspenBio, has no adequate remedy at law.

## PRAYER FOR RELIEF

Plaintiff therefore requests, on behalf of AspenBio, judgment as follows:

A. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B. Directing AspenBio to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AspenBio and its shareholders from a repeat of the damaging events described herein, including, but not limited to, removal of directors and officers who have breached their fiduciary duties, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1. a proposal to strengthen AspenBio's oversight of its research and development and other activities concerning its development stage products;

2. a proposal to mandate that the Board and/or a committee thereof review all material aspects of new product development and report periodically to all members of the Board with respect thereto;

3.      a proposal to strengthen the Board's oversight of the Company's internal controls;

4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

5.      a provision to permit the shareholders of AspenBio to nominate candidates for election to the Board;

C.      An order invalidating the election of directors to the Board approved based on the misleading Proxy Statements;

D.      An order invalidating the amendments to the 2002 Stock Incentive Plan approved based on the misleading Proxy Statements and rescinding the stock options granted to the Individual Defendants subsequent to the amendments;

E.      Extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Individual Defendants' trading activities or their other assets to assure that Plaintiff on behalf of AspenBio has an effective remedy;

F.      Awarding to AspenBio restitution from the Individual Defendants, each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

G.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 3, 2011

MARC M. UMEDA

MARC M. UMEDA
mumeda@robbinsumeda.com
GEORGE C. AGUILAR
gaguilar@robbinsumeda.com
ASHLEY R. PALMER
apalmer@robbinsumeda.com
LAUREN N. OCHENDUSZKO
lochenduszko@robbinsumeda.com
ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

*Counsel for Plaintiff*

556384

## VERIFICATION

I, Frank Trpisovsky, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Violations of the Securities Exchange Act of 1934, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment, and know the contents of it. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:


Dated: _____12/31/2010_____


_____
FRANK TRPISOVSKY